DA 08-0332

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 73

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

THOMAS SCHEFFER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2007-343
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Milton Datsopoulos, Peter Lacny, Datsopoulos, MacDonald & Lind, P.C., Missoula, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, Sheri K. Sprigg, Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney, Jennifer Clark, Andrew Paul, Deputy County Attorneys, Missoula, Montana

Submitted on Briefs: June 5, 2009

Decided: April 13, 2010

Filed:

_____
                     Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Thomas Eugene Scheffer appeals from his conviction of attempted tampering with or fabricating physical evidence, a felony, following a jury trial in the Fourth Judicial District Court, Missoula County.  We affirm.

## ISSUES

¶2    Scheffer raises three issues on appeal:

1.  Did the District Court err in denying Scheffer's motion to suppress?

2.  Did the District Court abuse its discretion in denying Scheffer's motion to dismiss the Amended Information?

3.  Must Scheffer's conviction of attempted tampering with or fabricating physical evidence be vacated as "irrationally inconsistent" with his acquittal of sexual intercourse without consent?

## GENERAL BACKGROUND

¶3    Shortly after midnight on August 25, 2007, Missoula County 9-1-1 received a report that Scheffer had attempted to rape a woman (whom we refer to herein as "H.K.") earlier that evening outside Larry's Six Mile tavern in Huson, Montana.[1]  Officers from the Missoula County Sheriff's Department responded to H.K.'s location to interview her and other individuals who had observed H.K.'s demeanor following the incident.  H.K.

---

[1] The audio recording of the 9-1-1 call was played to the jury at Scheffer's trial and is contained in the record on appeal.  H.K. is audibly upset and crying during the call. Remarkably, H.K. was (without explanation) interrupted and put on hold five times— complete with elevator music and a prerecorded voice thanking her for calling and for her patience—before she was able to recount fully all of the details of the alleged rape attempt.  About five minutes into the call, it was picked up by a second dispatcher, who put H.K. back on hold after she stated why she was calling.

told the officers that she had gone to Larry's Six Mile at around 10:00 that evening and, while there, had gotten into a conversation with Scheffer about Corvettes. According to H.K., Scheffer invited her outside to look at his Corvette Stingray and, at some point while they were outside, tried to kiss her. H.K. pulled away but Scheffer grabbed one of her arms. This caused her to fall to the ground with Scheffer on top of her. H.K. stated that he tried to pull up her shirt, but she resisted. Scheffer then moved one of his hands down the front of her pants and inside her underwear and inserted one or more of his fingers inside her vagina. H.K. said she then kicked Scheffer in order to get away.

¶4    After interviewing H.K., a deputy transported her to First Step in Missoula for a medical examination while two other officers attempted to locate Scheffer. They found him sitting in his Corvette with an unidentified female in the parking lot of Larry's Six Mile just after closing. The officers approached the car and asked Scheffer if he would speak with them. Scheffer agreed, and they walked over to Deputy Jon Gunter's patrol car. Initially, Scheffer was very cooperative, but he soon became defensive. When Gunter stated that he wanted to ask Scheffer about H.K., Scheffer preemptively exclaimed, "I didn't touch her." Sergeant Anthony Rio then read Scheffer his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), and Scheffer stated that he would speak with Rio and answer questions. Scheffer explained that the reason H.K. was upset and "freaked out" was because she had lost her purse. Scheffer stated that he had helped her find it. Rio noted that Scheffer's speech was slurred, his breath smelled of alcohol, and he rambled quite a bit during the interview, which took place over the course of 10 to 20 minutes.

¶5    Meanwhile, roughly 30 people were milling about in the parking lot, some jeering at the officers and others coming over to listen to the interview with Scheffer. These distractions were making it difficult to have a conversation, so Sergeant Rio suggested that Scheffer come down to the sheriff's office and give his statement there. Scheffer agreed; however, due to his intoxicated condition and the fact that he was a suspect, the officers patted him down, handcuffed him, and put him in the back of the patrol car.

¶6    At the sheriff's office, the officers removed the handcuffs and put Scheffer in an interrogation room, where he was questioned by Detective T.J. McDermott. McDermott observed that Scheffer appeared to be under the influence of alcohol but nevertheless was coherent and able to answer questions throughout the interview, which lasted roughly an hour. The video recording of the interview is contained in the record on appeal. Portions of it were played to the jury at trial.

¶7    Scheffer told McDermott that he and H.K. had been at Scheffer's shop (which is located adjacent to Larry's Six Mile tavern) earlier in the evening and that he had kissed H.K. several times there while the two of them were sitting on a couch. He claimed that H.K. had "begged" him to have sex with her but he had refused because of his friendship with H.K.'s fiancé. Scheffer emphatically denied touching H.K. (except for kissing her), and he likewise denied putting his hand down her pants and his fingers in her vagina. He suggested a number of times that McDermott bring H.K. and certain other individuals down to the stationhouse in order to clear everything up right then and there.

¶8    In light of H.K.'s allegation of digital penetration, McDermott told Scheffer that he wanted to swab Scheffer's fingers to test for the presence of H.K.'s DNA and thereby

4

corroborate Scheffer's story (assuming the test showed that her DNA was not present). Scheffer consented to this procedure. However, while McDermott was out of the room obtaining the swabbing materials, Scheffer quickly stuck three fingers of his right hand (the index, middle, and ring fingers) entirely in his mouth, moved them back and forth, took them out, rubbed his hands together, and then wiped his fingers on his jeans (all within the span of about six seconds). McDermott and Sergeant Rio observed these actions on a monitor in the hallway. Twenty seconds later, Scheffer briefly chewed on his right-hand fingernails.[2] After McDermott swabbed Scheffer's fingers, he confronted Scheffer about sticking his fingers in his mouth. Scheffer flatly denied doing so.

¶9      At the conclusion of the interview, McDermott placed Scheffer under arrest. The State subsequently charged him on September 11, 2007, with sexual intercourse without consent, a felony, in violation of § 45-5-503, MCA (Count I); tampering with or fabricating physical evidence, a felony, in violation of § 45-7-207, MCA (Count II); and unlawful restraint, a misdemeanor, in violation of § 45-5-301, MCA (Count III). Scheffer pleaded not guilty to these charges and subsequently filed a motion to suppress his statements and the evidence obtained during the interview with McDermott. He argued that he had requested the presence of counsel but that McDermott had continued

_____

[2] In the Statement of the Facts of the Appellant's Brief, Scheffer's counsel states that "[w]hen McDermott exited the room to obtain swabbing supplies, a nervous and intoxicated Scheffer began chewing his finger nails as he often does when plagued by stress." Counsel next states that McDermott "viewed Scheffer's nervous reaction much differently" as "sticking his fingers in his mouth and attempting to purposely remove DNA." The fact is, however, that Scheffer can be seen first sticking his fingers entirely in his mouth, taking them out, wiping them on his jeans, and refolding his arms, and then, 20 seconds later, chewing briefly on his fingernails. The implication that Scheffer and McDermott simply interpreted a single act differently is misleading and inaccurate.

5

to question Scheffer despite this request. The District Court reviewed the video recording and thereafter denied Scheffer's motion, concluding that he had not actually invoked his right to counsel.

¶10 On May 21, 2008 (seven days before trial), the State requested leave to file an Amended Information under § 46-11-205, MCA. The prosecutor explained that when the original Information was filed, the crime lab had not yet completed testing of the swabs of Scheffer's fingers; however, the testing had since been completed, and it revealed the presence of both Scheffer's DNA and H.K.'s DNA. The prosecutor thus asserted that Scheffer had "attempted to destroy the evidence, but was not successful," and she sought to amend Count II to allege *attempted* tampering with or fabricating physical evidence, a felony, in violation of §§ 45-4-103 and 45-7-207, MCA. The District Court granted the motion over Scheffer's objections that the amendment was untimely and the supporting affidavit was invalid. Scheffer entered a plea of not guilty to the amended charge.

¶11 A four-day jury trial commenced on May 28, 2008. Scheffer testified in his own defense. Contrary to what he had told Detective McDermott, Scheffer stated that when he and H.K. were on the couch in his shop, he put his hand in her pants and she put her hand in his pants. He further admitted that he put his fingers into her vagina, but he claimed that he did so with H.K.'s consent.

¶12 The jury ultimately found Scheffer not guilty of sexual intercourse without consent and unlawful restraint, but found him guilty of attempted tampering with or fabricating physical evidence. The District Court deferred imposition of sentence for a period of three years and imposed a $1,000 fine. Scheffer now appeals.

6

**DISCUSSION**

¶13 *Issue 1. Did the District Court err in denying Scheffer's motion to suppress?*

**I. Standard of Review**

¶14 In reviewing a district court's ruling on a motion to suppress evidence or statements, we determine whether the court's underlying findings of fact are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Munson*, 2007 MT 222, ¶ 18, 339 Mont. 68, 169 P.3d 364; *State v. Clark*, 2008 MT 419, ¶ 12, 347 Mont. 354, 198 P.3d 809. The court's findings are clearly erroneous if they are not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with a definite or firm conviction that a mistake has been made. *Munson*, ¶ 18.

**II. Legal Basis of Scheffer's Right-to-Counsel Claim**

¶15 As noted, Scheffer filed a motion to suppress his statements and the evidence obtained during the interview with McDermott on the ground that he had been denied his right to counsel. According to Scheffer, he made an unambiguous request for counsel, at which point all questioning should have stopped, and because it did not, any evidence obtained from the interrogation should have been suppressed. On appeal, the parties disagree as to which constitutional provisions govern this claim. In fact, Scheffer accuses the District Court and the State of having "confused" his Fifth Amendment and Sixth Amendment rights. It is necessary at the outset, therefore, before laying out the specific facts underlying Scheffer's claim, to clarify which right to counsel he was entitled to during the interrogation.

¶16 There are two distinct rights to counsel recognized under the Constitution. The first is the right to counsel in all criminal prosecutions. This right is expressly recognized by the Sixth Amendment to the United States Constitution, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right is also expressly recognized by Article II, Section 24 of the Montana Constitution, which states that "[i]n all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel." The right of the "accused" to the assistance of counsel in all "criminal prosecutions" is limited by its terms: It does not attach until a prosecution has been commenced, i.e., until adversary judicial criminal proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Rothgery v. Gillespie Co.*, ___ U.S. ___, 128 S. Ct. 2578, 2583 (2008) (Sixth Amendment); *State v. Schneider*, 2008 MT 408, ¶¶ 16-23, 347 Mont. 215, 197 P.3d 1020 (Article II, Section 24). Indeed, the core of this right is "a trial right, ensuring that the prosecution's case is subjected to the crucible of meaningful adversarial testing." *Kansas v. Ventris*, ___ U.S. ___, 129 S. Ct. 1841, 1845 (2009) (internal quotation marks omitted); *Schneider*, ¶ 23 (the Article II, Section 24 right to counsel is "a trial-based right"). However, because "today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality," *United States v. Wade*, 388 U.S. 218, 224, 87 S. Ct. 1926, 1931 (1967), the right to counsel under the Sixth Amendment and Article II, Section 24 extends (once the adversary judicial process has been initiated) to having

8

counsel present at all pretrial "critical" interactions between the defendant and the State, *see id.* at 224, 226, 87 S. Ct. at 1931, 1932; *Ventris*, 129 S. Ct. at 1845; *Montejo v. Louisiana*, ___ U.S. ___, 129 S. Ct. 2079, 2085 (2009); *Maine v. Moulton*, 474 U.S. 159, 170, 106 S. Ct. 477, 484 (1985); *Ranta v. State*, 1998 MT 95, ¶ 17, 288 Mont. 391, 958 P.2d 670.

¶17   The second right to counsel recognized under the Constitution derives from the privilege against self-incrimination and applies specifically to custodial interrogations. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Likewise, Article II, Section 25 guarantees that "[n]o person shall be compelled to testify against himself in a criminal proceeding." In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), the Supreme Court held that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467, 86 S. Ct. at 1624. Furthermore, because the modern practice of in-custody interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the Supreme Court concluded that "adequate protective devices" are necessary to dispel the compulsion inherent in custodial surroundings and to permit a full opportunity to exercise the privilege against self-incrimination. *Id.* at 458, 467, 86 S. Ct. at 1619, 1624; *see also Dickerson v. United States*, 530 U.S. 428, 434-35, 120 S. Ct. 2326, 2331 (2000); *State v. Morrisey*, 2009 MT 201, ¶¶ 27-28, 351 Mont. 144, 214 P.3d 708. One of the protective

9

devices recognized by the Court is the right of the individual to consult with a lawyer and to have the lawyer present with him during the custodial interrogation. *See Miranda*, 384 U.S. at 471, 474, 86 S. Ct. at 1626, 1628; *see also Montejo*, 129 S. Ct. at 2089 ("Under *Miranda*'s prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right."). The *Miranda* Court explained that

> [t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege [against self-incrimination] by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.

384 U.S. at 469, 86 S. Ct. at 1625. Once an individual has invoked his or her right to have counsel present during custodial interrogation, the interrogation must cease and officials may not reinitiate interrogation without counsel present. *See Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491 (1990). Although the *Miranda* right to counsel derives from the Fifth Amendment, we have indicated, both implicitly and explicitly, that the rights and procedures dictated by *Miranda* are required by Article II, Section 25 of the Montana Constitution as well. *See e.g. Schneider*, ¶ 27; *State v. Hurlbert*, 2009 MT 221, ¶ 33, 351 Mont. 316, 211 P.3d 869; *State v. Buck*, 2006 MT 81, ¶¶ 45-48, 331 Mont. 517, 134 P.3d 53; *State v. Olson*, 2003 MT 61, ¶¶ 13-14, 314 Mont. 402, 66 P.3d 297.

¶18 The policies and interests underlying these two rights are distinct, *see Patterson v. Illinois*, 487 U.S. 285, 297, 108 S. Ct. 2389, 2397 (1988), as are the applicable standards,

*see e.g. Fellers v. United States*, 540 U.S. 519, 524, 124 S. Ct. 1019, 1022-23 (2004). The Sixth Amendment/Article II, Section 24 right to counsel, applicable throughout the course of a criminal prosecution, protects "the unaided layman at critical confrontations with his expert adversary, the government, *after* the adverse positions of government and defendant have solidified with respect to a particular alleged crime." *McNeil v. Wisconsin*, 501 U.S. 171, 177-78, 111 S. Ct. 2204, 2208-09 (1991) (internal quotation marks omitted). This right is thus offense specific. *Id.* at 175, 111 S. Ct. at 2207; *Schneider*, ¶ 23. In contrast, the Fifth Amendment/Article II, Section 25 right to counsel, applicable during a custodial interrogation, protects "the suspect's desire to deal with the police only through counsel." *McNeil*, 501 U.S. at 178, 111 S. Ct. at 2209 (internal quotation marks omitted). This right is thus *not* offense specific, and "[o]nce a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." *Id.* at 177, 111 S. Ct. at 2208; *see also Arizona v. Roberson*, 486 U.S. 675, 108 S. Ct. 2093 (1988). Hence, the interest protected by the Fifth Amendment guarantee "is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding *any* suspected crime and attaches whether or not the 'adversarial relationship' produced by a pending prosecution has yet arisen)." *McNeil*, 501 U.S. at 178, 111 S. Ct. at 2209. It is worth noting that *both* rights to counsel may be applicable in certain situations—for example, at a postarraignment custodial interrogation. *See Montejo*, 129 S. Ct. at 2090;

11

*Michigan v. Jackson*, 475 U.S. 625, 629, 106 S. Ct. 1404, 1407 (1986), *overruled on other grounds*, *Montejo*, 129 S. Ct. at 2091.

¶19     In addition to the foregoing distinctions, the consequences of violating the two rights differ in some important respects (at least insofar as federal law is concerned). The privilege against self-incrimination protects a person "only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 2643 (1990) (internal quotation marks omitted); *see also Oregon v. Elstad*, 470 U.S. 298, 304, 105 S. Ct. 1285, 1290 (1985) ("The Fifth Amendment, of course, is not concerned with nontestimonial evidence."); *State v. Devlin*, 1999 MT 90, 294 Mont. 215, 980 P.2d 1037. The *Miranda* safeguards, in turn, serve to protect the privilege by requiring that when a person is in custody, he must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Miranda*, 384 U.S. at 478-79, 86 S. Ct. at 1630; *State v. Buck*, 2006 MT 81, ¶¶ 35, 45, 331 Mont. 517, 134 P.3d 53. Failure to give these warnings and obtain a valid waiver of rights prior to questioning, or failure to fully honor the exercise of these rights throughout the interrogation, generally requires the exclusion of any *testimonial* evidence (i.e., communications) obtained. *See Miranda*, 384 U.S. at 467, 476, 479, 86 S. Ct. at 1624, 1629, 1630; *State v. Morrisey*, 2009 MT 201, ¶ 28, 351 Mont. 144, 214 P.3d 708. However, the Supreme Court has refused to apply the fruit-of-the-poisonous-tree

doctrine[3] to exclude *derivative* evidence (i.e., evidence discovered as a result of a statement obtained in violation of *Miranda*).[4] *See United States v. Patane*, 542 U.S. 630, 124 S. Ct. 2620 (2004); *see also Elstad*, 470 U.S. 298, 105 S. Ct. 1285 (rejecting application of the fruits doctrine to a second confession that followed a first confession obtained in violation of *Miranda*); *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004) (again declining to apply the fruits doctrine to a second confession); Wayne R. LaFave et al., *Criminal Procedure* vol. 3, § 9.5(a)-(c), 466-82 (3d ed., West 2007).

¶20    In contrast, the Sixth Amendment right to counsel is not a "protective device" that functions solely as a safeguard against compelled self-incrimination.  Indeed, "the Sixth Amendment's protection of the attorney-client relationship—the right to rely on counsel as a 'medium' between [the accused] and the State—extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel." *Patterson*, 487 U.S. at 296 n. 9, 108 S. Ct. at 2397 n. 9 (brackets in *Patterson*, some internal quotation marks omitted). The Sixth Amendment right to counsel is specifically affirmed in the Constitution, and it

---

[3] *See Missouri v. Seibert*, 542 U.S. 600, 612 n. 4, 124 S. Ct. 2601, 2610 n. 4 (2004) (plurality opinion) (explaining that under the fruit-of-the-poisonous-tree doctrine, "evidence otherwise admissible but discovered as a result of an earlier violation is excluded as tainted, lest the law encourage future violations").

[4] We have not yet decided whether the fruits doctrine applies under Article II, Section 25, *see Morrisey*, 351 Mont. at 157 n. 4, 214 P.3d at 719 n. 4, and while Scheffer asserts the exclusionary rule in this case, none of his authorities address specifically the exclusion of derivative evidence acquired as a result of a violation of the Article II, Section 25 right to counsel.  Of course, it should be noted that the fruits of *actually* compelled statements must be excluded.  *See New Jersey v. Portash*, 440 U.S. 450, 458-59, 99 S. Ct. 1292, 1296-97 (1979); *United States v. Hubbell*, 530 U.S. 27, 37-38, 120 S. Ct. 2037, 2044 (2000).  Also, the Due Process Clause provides some protection against the compulsion of evidence.  *See Rochin v. California*, 342 U.S. 165, 172-74, 72 S. Ct. 205, 209-10 (1952).  But no factual grounds have been presented in the present case for concluding that the evidence in question was the product of actual compulsion.

broadly guarantees an accused "aid in coping with legal problems or assistance in meeting his adversary" (the government) at critical stages of the criminal proceedings. *United States v. Ash*, 413 U.S. 300, 310-11, 313, 93 S. Ct. 2568, 2574, 2575 (1973). It also protects the integrity and fairness of the adversary criminal process. *See Lockhart v. Fretwell*, 506 U.S. 364, 368-69, 113 S. Ct. 838, 842 (1993); *Nix v. Williams*, 467 U.S. 431, 446, 104 S. Ct. 2501, 2510 (1984). It thus is not limited to testimonial evidence, and the fruits doctrine applies to Sixth Amendment violations. *See e.g. Brewer v. Williams*, 430 U.S. 387, 406 n. 12, 97 S. Ct. 1232, 1243 n. 12 (1977) (due to Sixth Amendment violation, neither the defendant's incriminating statements nor any testimony describing his having led the police to the victim's body was admissible); *Nix*, 467 U.S. at 441-50, 104 S. Ct. at 2507-12 (in the context of a Sixth Amendment violation, acknowledging the fruits doctrine and applying the inevitable-discovery exception to it); *Wade*, 388 U.S. at 239-42, 87 S. Ct. at 1939-40 (evidence based on identification made at postindictment lineup, in violation of the accused's Sixth Amendment right to counsel, is inadmissible); *accord Gilbert v. California*, 388 U.S. 263, 272-74, 87 S. Ct. 1951, 1956-57 (1967).

¶21 Recognizing these distinctions, Scheffer insists that his right-to-counsel claim is governed by the Sixth Amendment and Article II, Section 24. As noted, he was acquitted of sexual intercourse without consent and unlawful restraint, but was found guilty of attempted tampering with or fabricating physical evidence. The primary evidence obtained from the interrogation and introduced at trial to prove this charge did not consist of testimonial statements given by Scheffer, but rather consisted of the videotape recording of what Scheffer did (sticking his fingers in his mouth) and the testimony of

14

Detective McDermott and Sergeant Rio about what they witnessed through the hallway monitor (Scheffer sticking his fingers in his mouth). For the reasons discussed above, Scheffer faces significant obstacles to suppressing this evidence under a Fifth Amendment/Article II, Section 25 theory. Thus, Scheffer cites the Sixth Amendment, Article II, Section 24, and *Wade*, 388 U.S. 218, 87 S. Ct. 1926, in arguing that he is entitled to suppression of his "conduct" because he was questioned in the absence of counsel at a "critical stage" proceeding.

¶22 The State counters that Scheffer's claim is governed by the Fifth Amendment and Article II, Section 25, not the Sixth Amendment and Article II, Section 24, given that the interrogation was not part of a "judicial proceeding." In response, Scheffer maintains his Sixth Amendment/Article II, Section 24 argument, but also argues that even if the Fifth Amendment and Article II, Section 25 apply, he had the right to have counsel present, this right was infringed, and his motion to suppress should have been granted.

¶23 The State is correct that the Fifth Amendment and Article II, Section 25 apply to Scheffer's claim. As explained above, the Sixth Amendment/Article II, Section 24 right to counsel does not attach until adversary judicial criminal proceedings have been initiated, and there is no question that at the time of the McDermott-Scheffer interview, the State had not yet commenced a formal criminal prosecution against Scheffer. *See State v. Schneider*, 2008 MT 408, ¶¶ 17, 21, 347 Mont. 215, 197 P.3d 1020. Scheffer's argument to the contrary (that the Sixth Amendment and Article II, Section 24 apply) is based entirely on *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758 (1964). In *Escobedo*—which, it should be noted, was decided two years before the Supreme Court

15

issued its decision in *Miranda*—the defendant (Escobedo) was arrested, taken to police headquarters, and interrogated. Despite his repeated requests to speak to his retained lawyer, he was afforded no opportunity to do so during the course of the interrogation. He ultimately made an incriminating statement. On appeal, the Supreme Court concluded that although the interrogation was conducted *before* Escobedo was formally indicted, his Sixth Amendment right to counsel nevertheless applied under the particular circumstances. The Court held

> that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution . . . .

*Id.* at 490-91, 84 S. Ct. at 1765. In short, "when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession— our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." *Id.* at 492, 84 S. Ct. at 1766. Relying on this holding, Scheffer argues that McDermott's interrogation of him "was an accusatory process rather than a general investigation," that he was "an accused rather than a mere suspect," that "the underlying purpose of the interrogation was to get [him] to confess his guilt," and that "the 'guiding hand of counsel' was essential" to advise him of his rights.

¶24    What Scheffer doggedly fails to accept, however, in the face of contrary authority cited by the State, is that subsequent decisions of the Supreme Court

16

> foreclose any reliance on *Escobedo* . . . for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings. Although *Escobedo* was originally decided as a Sixth Amendment case, the Court in retrospect perceived that the prime purpose of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, to guarantee full effectuation of the privilege against self-incrimination.

*Moran v. Burbine*, 475 U.S. 412, 429, 106 S. Ct. 1135, 1145 (1986) (internal quotation marks omitted); *accord United States v. Gouveia*, 467 U.S. 180, 188 n. 5, 104 S. Ct. 2292, 2297 n. 5 (1984) ("[W]e required counsel in . . . *Escobedo* in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel."). While Scheffer still insists that *Escobedo* permits application of the Sixth Amendment right to counsel "in certain instances" before adversary judicial criminal proceedings have been initiated, the Supreme Court has stated otherwise, *see Moran*, 475 U.S. at 429, 106 S. Ct. at 1145; *Rothgery*, 128 S. Ct. at 2583 ("The Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions . . . does not attach until a prosecution is commenced." (internal quotation marks omitted)), and Scheffer's argument, therefore, is simply wrong. Accordingly, we conclude that his Sixth Amendment right to counsel had not arisen at the time of the interrogation, which occurred *before* Scheffer was formally charged, *see State v. Reavley*, 2003 MT 298, ¶¶ 37-45, 318 Mont. 150, 79 P.3d 270, and we reach the same conclusion under Article II, Section 24, *see Schneider*, ¶ 23 ("[T]he Montana right applies with respect to an offense *when prosecution has been commenced* for that offense." (emphasis added)). We are left, then, with the question of whether Scheffer's right to counsel under the Fifth Amendment and Article II, Section 25 was violated.

17

### III. The Merits of Scheffer's Right-to-Counsel Claim

¶25    Initially, we note that there is no dispute that the McDermott-Scheffer interview constituted a "custodial interrogation" and, consequently, that Scheffer had the right to counsel under the Fifth Amendment and Article II, Section 25. The State contends, however, that he did not adequately assert this right and that the right, therefore, was not violated. Alternatively, the State contends that even if the right was violated, the exclusionary rule does not apply to evidence of criminal conduct (here, Scheffer's attempting to tamper with physical evidence on his fingers) committed in response to a claimed constitutional violation.[5] Scheffer disputes the State's arguments on both points; however, because we agree with the State's first argument, we do not reach the second.

¶26    If a suspect knowingly and voluntarily waives his right to counsel after receiving the *Miranda* warnings (as Scheffer concedes he did here), law enforcement officers are free to question him. *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 2354 (1994). But if the suspect later requests counsel at any time during the interview, he is not subject to further questioning regarding any offense unless an attorney is actually present or the suspect himself reinitiates conversation. *Id.* at 458, 114 S. Ct. at 2354-55. The question here is whether Scheffer actually invoked his right to counsel after initially waiving it. This is an objective inquiry, *id.* at 458-59, 114 S. Ct. at 2355, and the

---

[5] *See e.g. People v. Luffman*, 650 N.Y.S.2d 354, 357 (N.Y. App. Div. 3d Dept. 1996) (the legal protection of *Miranda* as to the crimes for which the defendant was already in custody do not extend to a new crime committed in the officer's presence); *accord United States v. Smith*, 7 F.3d 1164, 1167 (5th Cir. 1993); *United States v. Pryor*, 32 F.3d 1192, 1196 (7th Cir. 1994); *cf. State v. Courville*, 2002 MT 330, ¶ 23, 313 Mont. 218, 61 P.3d 749 (the exclusionary rule does not apply to evidence of criminal conduct committed in response to a claimed Fourth Amendment violation).

Supreme Court has said that in this situation (i.e., after the suspect has waived the *Miranda* rights), a request for counsel must be "clear" and "unambiguous," *id.* at 459, 461, 114 S. Ct. at 2355, 2356. Of course, he "need not 'speak with the discrimination of an Oxford don.' " *Id.* at 459, 114 S. Ct. at 2355. As we have noted before, laypeople are not learned in constitutional principle or legal nicety, and to require that precise words be uttered would elevate form over substance. *State v. Morrisey*, 2009 MT 201, ¶ 40, 351 Mont. 144, 214 P.3d 708. But, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355. If the suspect "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the officer is not required to cease questioning. *Id.* It is "good police practice," however, for the interviewing officer to clarify whether or not the suspect actually wants an attorney. *See id.* at 461, 114 S. Ct. at 2356; *Morrisey*, ¶ 41 n. 8. Indeed, "custodial officers who press on with questioning assuming that a suspect's statements or conduct are *not* indications of the suspect's desire to retain his Fifth Amendment rights do so at the risk of suppression of the suspect's subsequent statements." *United States v. Plugh*, 576 F.3d 135, 141 (2d Cir. 2009); *see also Davis*, 512 U.S. at 461, 114 S. Ct. at 2356 ("Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel.").

¶27 These principles, of course, are based on the Fifth Amendment. With respect to invoking the Article II, Section 25 right to counsel in custodial interrogations, this Court has stated that "we refuse to 'march lock-step' with the United States Supreme Court when the provisions of the Montana Constitution call for greater protection of an individual's rights than that guaranteed by the United States Constitution." *State v. Spang*, 2002 MT 120, ¶ 22, 310 Mont. 52, 48 P.3d 727 (citing *State v. Johnson*, 221 Mont. 503, 512, 719 P.2d 1248, 1254 (1986)); *see also State v. Buck*, 2006 MT 81, ¶¶ 45-48, 331 Mont. 517, 134 P.3d 53 (clarifying that *Spang* and *Johnson* involved the right to counsel under Article II, Section 25, not Article II, Section 24, and stating that invocation of this right "depends on the evident purpose of the suspect's statement, as viewed in light of the circumstances and in light of the rule that requests for counsel must be construed broadly"). In *Spang*, we declined to accept the State's analysis based on *Davis* and instead purported to rely on Article II, Section 25 in concluding that the defendant had adequately invoked his right to counsel. *See Spang*, ¶¶ 19, 22-25. In the present case, however, while Scheffer cites Article II, Section 25, he offers no argument that his alleged assertion of his right to counsel under this provision, even if inadequate under *Davis*, was still adequate under *Johnson*, *Spang*, and *Buck*. Accordingly, we limit our analysis to the standards set forth in *Davis* and recited above.

¶28 It is appropriate at this juncture to lay out the relevant portions of the colloquy between Detective McDermott and Scheffer. At the outset of the interview, McDermott introduced himself and asked, "What's going on tonight?" Scheffer responded, "I don't [expletive] know what the deal is here." Scheffer then proceeded to explain that he knew

20

H.K., her family, and her fiancé. McDermott interrupted, however, in order to read

Scheffer the *Miranda* warnings. The following exchange occurred:

> McDermott: Hold on real quick, though, okay?
> Scheffer: Sure.
> McDermott: There's a form that I just need to go over with you real quick—
> Scheffer: Sure. No problem.
> McDermott: —just uh—
> Scheffer: You bet. No problem.
> McDermott: —before we get started. It's just—
> Scheffer: I don't care. I mean, I don't need an attorney or nothing. [Inaudible.] Read me my rights. I don't care.
> McDermott: I just have a form, you know?
> Scheffer: Sure. No problem. You bet.
> McDermott: That way, my boss will be happy. So—
> Scheffer: Yeah, yeah.
> McDermott: Let me just read this for you, okay?
> Scheffer: Sure. Go ahead.
> McDermott: Just kind of a standard deal.
> Scheffer: But could you do something for me?

At this point, Scheffer asked McDermott to bring H.K. to the stationhouse in order to

"clear everything up." Scheffer claimed that H.K. presently was with a guy doing drugs

and that Scheffer knew how to reach her. McDermott responded, "Okay. Well, let me

get through this, then we'll talk about that." The dialogue continued:

> McDermott: So, anyway, these are your Miranda warnings.
> Scheffer: Sure. No problem.
> McDermott: They state you have the right to remain silent. Anything you say can and will be used against you in a court of law.
> Scheffer: So should I remain silent, or should I stand up for myself?
> McDermott: Tommy, let me get through this, okay, then I'll answer any questions for you. Just let me read through this first.
> Scheffer: Okay.
> McDermott: So again, you do have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak to a lawyer and have your lawyer present before this interview proceeds. If you are unable to

21

pay for a lawyer, the court will appoint one for you at public expense before this interview continues. And should you decide to cooperate in this interview, you still have the right to stop at any time, okay, and then request to have a lawyer present with you before you participate any further. So, do you understand your rights?

Scheffer: Yes.

McDermott: Okay. So if you could just sign here, this is just a record. It protects you, it protects me, that I did my job and treated you right. Can you date it for me? Just put the 25th. I just want to make sure I treat you right tonight, okay? So, I do not know much about what's going on. I'll certainly look into some of these other things you have, but let's just start with what happened tonight. That's probably the best—

Scheffer: Let me start here. Am I under arrest?

McDermott: At this point, you're being detained, and at the end of this—

Scheffer: Where's she at?

McDermott: —investigation—

Scheffer: Where's she at?

McDermott: Tommy, listen to me.

Scheffer: I'm listening.

McDermott: At this point—

Scheffer: Maybe I should call my lawyer.

McDermott: Maybe you're not listening to me, Tommy.

Scheffer: Maybe I should call him.

McDermott: Listen, I'm trying to treat you right. I'm trying—

Scheffer: I've done nothing but try to help people tonight—

McDermott: Okay.

Scheffer: —and this is bullshit.

McDermott: Tommy, at this point we're doing an investigation. You're gonna be detained. Sounds like you cooperated. You wanted to sit and talk to me—

Scheffer: Let's get, let's get my lawyer here.

McDermott: Okay.

Scheffer: Yeah. Let's get Bobby here, her fiancé here. Tell him what really happened.

McDermott: Okay. But don't you think it'd be wiser if I talked to you first so that I know the story?

Scheffer: No, not really.

McDermott: Okay.

Scheffer: Let's get my lawyer here. This is, I mean, I'm, this is, you guys should never have brought me down here. I've done nothing but found her purse. She gave her car to a friend. I

wasn't gonna let her car get wrecked. I talked her into going to get her car. I found her [purse], and she freaked out because she didn't have Bobby and hers credit cards. [Inaudible] people she didn't know. I went and got that, gave it to, I did nothing but help her. And she wanted to fuck, she wanted to do this. She'd been on drugs all night last night. Find her, I can take you to my house and show you the guy she's with right now, who she did drugs with all night last night. You can call that number. I'll guarantee that's who she's with now. That's what she wanted to go do. She said she was going to go see him.

McDermott: Okay.

Scheffer: This is bullshit. I am not at fault here. She wants to lay me at fault for why, for Bobby, why she's going, not getting married, this is bullshit. I never touched her. Get her, look, take her to the hospital, get her tested, vaginal. I never have touched [H.K.]. Ever. This is bullshit. I should not be here.

McDermott: Okay. Well, Tommy, the question is you need to decide if you want to talk to me about this or—

Scheffer: What do you wanna talk, what do you wanna ask me?

McDermott: —if you want to talk to a lawyer.

Scheffer: What do you, am I under arrest? What do you wanna ask me, and I'll just tell you what I wanna, if I wanna talk to a lawyer or not, 'cause I should not be here.

McDermott: Okay.

Scheffer: I should be home in bed sleeping with my kids right now.

McDermott: Okay. Well, do you understand your rights?

Scheffer: Yes I do.

McDermott: Okay. Do you want to talk to me a little bit about it, and you can still stop—

Scheffer: Ask me, you, you ask me what you want you wanna ask me.

The conversation proceeded from here into a discussion of the evening's events.

¶29    Scheffer argues that he made an unambiguous request for counsel when he said "let's get my lawyer here." In fact, he claims he made multiple invocations of this right. Yet, while Scheffer did indeed mention a "lawyer" several times, we cannot agree that a reasonable officer in the circumstances would have understood his statements to be a request for an attorney (in the sense that he wanted to deal with McDermott only through

23

counsel). In this regard, while Scheffer isolates specific passages from the transcript, it is important to note that "our analysis does not end with words alone; . . . we also consider the circumstances in which the statement was made." *United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009). Doing so, we agree with the District Court's assessment:

> [Scheffer] here had no intention to invoke his right to counsel, but rather had an overwhelming desire to explain his version of what happened no matter what. It appears to the Court that [Scheffer] believed he could talk his way out of the situation and very much wanted the chance to do so. As a part of this course of action, the mention of a lawyer was a part of [Scheffer's] early-on suggestion to the officer that he immediately assemble everybody that might have any relationship to the matter under investigation, including his lawyer, and get to the bottom of it right then and there. In the face of [Scheffer's] eagerness to talk[,] Detective McDermott showed much restraint in trying to slow him down and doing exactly what the Montana and United States Supreme Courts require. He clarified if [Scheffer's] equivocal statements were a request for a lawyer. They were not.

¶30 We addressed a similar scenario in *State v. Maestas*, 2006 MT 101, 332 Mont. 140, 136 P.3d 514. The defendant (Maestas), immediately after demanding an attorney, and without interruption, told the detective to question another witness about the events in question: "Now, give me a fucking lawyer 'cause I don't have to sit here and fucking put up with this bullshit, 'cause I ain't done nothin'. You can ask Jim, the owner, what time we left." The detective immediately instructed Maestas to stop talking and tell him whether he wished to have counsel present before proceeding. He asked Maestas at least six times whether he wanted an attorney, and Maestas repeatedly told him that he did not. *See Maestas*, ¶¶ 6, 18. We concluded under these circumstances that Maestas' requests for a lawyer were equivocal and that it was appropriate for the detective to determine what Maestas truly wanted. *Maestas*, ¶¶ 18-19.

24

¶31 In the present case, while Scheffer asserts that his supposed requests for counsel were met with "coercive responses" and "interview tactics," the fact is that McDermott was simply attempting to respond to Scheffer's various questions and suggestions—obviously a difficult task, given Scheffer's repeated interruptions. Moreover, Scheffer's references to a "lawyer" were equivocal at best, given his initial statement that "I don't need an attorney or nothing," followed closely thereafter by his remarks that "Maybe I should call my lawyer" and his suggestions that they bring various people (including his lawyer) down to the stationhouse to clear everything up. *Cf. Davis*, 512 U.S. at 462, 114 S. Ct. at 2357 ("Maybe I should talk to a lawyer" is not an unambiguous request for counsel). As noted, if a suspect makes a reference to an attorney that is ambiguous or equivocal, in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the officer is not required to cease questioning. The prudent course of action, though, is for the officer to clarify whether the suspect actually wants an attorney. And that is what McDermott did. He told Scheffer: "Well, Tommy, the question is you need to decide if you want to talk to me about this or if you want to talk to a lawyer." Scheffer responded: "What do you wanna ask me, and I'll just tell you what I wanna, if I wanna talk to a lawyer or not . . . ." The conversation proceeded from there, without Scheffer ever stating that he wanted to talk to a lawyer. He later engaged in the conduct that formed the basis of the attempted-tampering charge.

¶32 We accordingly hold that Scheffer did not make an unambiguous request for counsel. Hence, the District Court did not err in denying his motion to suppress.

25

¶33    ***Issue 2.  Did the District Court abuse its discretion in denying Scheffer's motion to dismiss the Amended Information?***

¶34    We review for abuse of discretion a district court's decision whether to allow the amendment of an information.  *State v. Wilson*, 2007 MT 327, ¶ 19, 340 Mont. 191, 172 P.3d 1264.  A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.

¶35    As noted, the State charged Scheffer in the Information filed September 11, 2007, with tampering with or fabricating physical evidence, a felony, in violation of § 45-7-207, MCA (2005).   On May 21, 2008, the State requested leave to file an Amended Information changing this charge to *attempted* tampering with or fabricating physical evidence, a felony, in violation of §§ 45-4-103 and 45-7-207, MCA.[6]  The reason for this amendment was that the testing of the swabs of Scheffer's fingers by the crime lab, which had not been completed at the time the original Information was filed, had since been completed and revealed the presence of both Scheffer's DNA and H.K.'s DNA, thus indicating that Scheffer had not destroyed this evidence (by sticking his fingers in his mouth during the interrogation), but rather had unsuccessfully attempted to do so.  The prosecutor sought "to conform [the charge] to the evidence in the case."

¶36    Scheffer moved to dismiss the tampering and attempted-tampering charges.  As to the former, he reasoned that the State's amendment constituted a tacit admission that it

---

[6] Section 45-4-103(1), MCA, states that "[a] person commits the offense of attempt when, with the purpose to commit a specific offense, he does any act toward the commission of such offense."

could not prove he had *actually* tampered with physical evidence. As to the latter, he argued that the Amended Information was untimely under § 46-11-205(1), MCA, which states that the trial court may allow an information to be amended in matters of substance at any time, "but not less than 5 days before trial." The District Court denied Scheffer's motion, concluding that the Amended Information was filed in a timely manner and that Scheffer had not been prejudiced by the amendment of the charge.

¶37 On appeal, Scheffer argues that the District Court erred in its determination that the Amended Information was timely filed. In this regard, both he and the State dispute which time-computation rule governs calculations under § 46-11-205(1), MCA. We need not resolve this dispute, however, because we agree with the State that the amendment was one of form, not substance, and as such was permissible under § 46-11-205(3), MCA.

¶38 An information is a written accusation of criminal conduct prepared by a prosecutor in the name of the State. *Wilson*, ¶ 25. The information must reasonably apprise the accused of the charges against him, so that he may have the opportunity to prepare and present his defense. *Wilson*, ¶ 25. "The court may permit an information to be amended as to form at any time before a verdict or finding is issued if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced." Section 46-11-205(3), MCA. An amendment is one of form when the same crime is charged, the elements of the crime and the proof required remain the same, and the defendant is informed of the charges against him. *Wilson*, ¶ 26. To differentiate amendments of form and substance, we examine whether an amendment to an

27

information or complaint alters the nature of the offense, the essential elements of the crime, the proofs, or the defenses. *Wilson*, ¶ 26.

¶39 In the present case, the nature of the offense was the same, the essential elements of the crime remained the same, and there is no indication that the proofs or the defenses changed in response to the amendment. The alleged facts underlying the tampering and attempted-tampering charges were identical: Scheffer first penetrated H.K.'s vagina with his fingers; he later stuck his fingers in his mouth and wiped them on his jeans at the stationhouse, prior to their being swabbed for DNA. The only difference in the State's proof following the amendment was that the swabs revealed the presence of both Scheffer's DNA and H.K.'s DNA, instead of inconclusive results or no DNA at all, thus indicating that he did not *actually* "alter, destroy, conceal, or remove" the evidence, *see* § 45-7-207(1)(a), MCA, but only *attempted* to do so. There were no new allegations of additional or different instances of criminal conduct. *Cf. City of Red Lodge v. Kennedy*, 2002 MT 89, ¶¶ 15-16, 309 Mont. 330, 46 P.3d 602. The amended charge was identical to the original charge except that the phrase "altered, destroyed, concealed, or removed" in the original charge was replaced with the phrase "attempted to alter, destroy, conceal, or remove" in the amended charge. *Cf. State v. Matson*, 227 Mont. 36, 43, 736 P.2d 971, 975 (1987) (insertion of the word "serious" before the phrase "bodily injury" to describe the charge of aggravated assault was an amendment of form); *State v. Clark*, 1998 MT 221, ¶ 52, 290 Mont. 479, 964 P.2d 766 (change from possession of methamphetamine to possession of amphetamine was an amendment of form).

¶40 Furthermore, while Scheffer claims the amendment was "greatly injurious" to his substantive rights and "drastically interfered" with his ability to prepare a defense, he proffers nothing concrete in support of these bald assertions. He speculates that had he "been afforded adequate opportunity to prepare a defense to the 'attempt' charge, defense counsel may have theorized during cross-examination and closing that Scheffer could not have attempted to tamper with physical evidence of a crime he did not commit." We fail to see, however, how he was precluded from making this argument. A plausible change in his defense is suggested in the attempt statute itself, which states that "[a] person shall not be liable under this section if, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, he avoided the commission of the offense attempted by abandoning his criminal effort." Section 45-4-103(4), MCA. But again, there is no indication that Scheffer was precluded in any way from presenting such evidence and making this argument at trial. Finally, the State points out that Scheffer was not exposed to any greater punishment as a result of the amendment, given that tampering and attempted-tampering convictions lead to the same possible punishment. *See* § 45-4-103(3), MCA; *cf. State v. Gardipee*, 2004 MT 250, ¶ 9, 323 Mont. 59, 98 P.3d 305 (defendant's substantial rights were not prejudiced by amendment of the information on the morning of trial from misdemeanor partner or family member assault to felony partner or family member assault, since the amendment merely reflected the statutorily mandated sentencing range for a repeat offender).

¶41 Based on the foregoing, we conclude that the amendment of the tampering charge to an attempted-tampering charge was a timely amendment as to form and that Scheffer's

29

substantial rights were not prejudiced by this amendment. Section 46-11-205(3), MCA. Accordingly, the District Court did not abuse its discretion in denying Scheffer's motion to dismiss the Amended Information.

¶42 ***Issue 3. Must Scheffer's conviction of attempted tampering with or fabricating physical evidence be vacated as "irrationally inconsistent" with his acquittal of sexual intercourse without consent?***

¶43 Scheffer claims his conviction of attempted tampering with or fabricating physical evidence must be set aside because it is "irrationally inconsistent" with his acquittal of sexual intercourse without consent. He contends that the verdict of not guilty on the rape charge means that the alleged rape never occurred, and from this he reasons that "it was a practical impossibility for Scheffer to tamper with or attempt to tamper with any evidence of a non-existent rape" and, thus, that the jury "could not have logically concluded that Scheffer attempted to tamper with evidence related to a rape that never occurred."

¶44 As the State points out, however, this argument is inconsistent with the elements of the attempted-tampering offense. The State had to prove that Scheffer, believing that an official proceeding or investigation was pending or about to be instituted, attempted to alter, destroy, conceal, or remove any "thing" (specifically, DNA evidence) with purpose to impair its verity or availability in such proceeding or investigation. *See* §§ 45-4-103, 45-7-207(1)(a), MCA (2005). The State was not required to prove that the official proceeding or investigation actually resulted in the conviction of a crime; rather, it had to prove that Scheffer believed that an official proceeding or investigation was pending or about to be instituted and that Scheffer's purpose was to impair the verity or availability of the evidence in such proceeding or investigation—evidence which, it should be noted,

30

Detective McDermott had specifically requested for purposes of his investigation into H.K.'s allegations.

¶45 Furthermore, even if an actual rape "never occurred," it does not necessarily follow that it was a "practical impossibility" for Scheffer to attempt to tamper with evidence of the events and acts in question. To convict on the rape charge, the State had to prove beyond a reasonable doubt that Scheffer knowingly had sexual intercourse without consent with H.K., *see* § 45-5-503(1), MCA, which here means that he penetrated her vulva with his finger or fingers (presumably for purposes of sexual arousal or gratification), *see* § 45-2-101(68), MCA, and that H.K. was compelled to submit by force or was incapable of consent, *see* § 45-5-501(1), MCA. Scheffer admitted at trial that he put his fingers into H.K.'s vagina. Thus, he now observes on appeal that "[t]he rape acquittal inherently suggests that any contact between Scheffer and [H.K.] was found to be consensual." In other words, while the evidence established that Scheffer penetrated H.K.'s vulva, the State failed to prove that this was without consent. Yet, the DNA evidence on his fingers did not go to the element of consent; rather, it went to prove penetration, which indisputably did occur. Thus, the fact that the jury apparently determined that the penetration was consensual does not negate the fact that the DNA evidence was evidence of the charged offense, nor does it negate the fact that Scheffer attempted to tamper with this evidence by sticking his fingers into his mouth.

¶46 We conclude that Scheffer's conviction of attempting to alter, destroy, conceal, or remove physical evidence relating to a pending official proceeding or investigation into

31

his alleged sexual intercourse without consent with H.K. is not "irrationally inconsistent" with his ultimate acquittal of that underlying charge.

**CONCLUSION**

¶47 The District Court did not err in denying Scheffer's motion to suppress and did not abuse its discretion in denying Scheffer's motion to dismiss the Amended Information. His conviction of attempted tampering with or fabricating physical evidence need not be vacated as "irrationally inconsistent" with his acquittal of sexual intercourse without consent.

¶48 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE