DA 11-0733

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 81

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JEFFREY ALLEN NIXON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 10-137C
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, Smith & Stephens, P.C.; Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Pamela P. Collins, Assistant
Attorney General; Helena, Montana

          Ed Corrigan, Flathead County Attorney; Alison Howard, Lori Adams,
Deputy County Attorneys; Kalispell, Montana

Submitted on Briefs:  January 9, 2013

Decided:   March 26, 2013

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Following a five-day trial in July 2011, a jury convicted Jeffrey Allen Nixon of accountability for deliberate homicide, robbery, tampering with physical evidence, and burglary—all felonies. Nixon appeals his conviction on the ground that the Montana Eleventh Judicial District Court, Flathead County, erred in denying his motion to suppress statements he made during a custodial interrogation. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     On April 17, 2010, Sergeant Jim Wardensky of the Kalispell Police Department responded to a report from Wesley Collins's landlord that his apartment had been burglarized. Police had been to the apartment the day before for a requested welfare check on Collins and had not found him. While Wardensky was investigating the break-in, by-standers told additional responding officers that two individuals were running out the back window of Collins's apartment. One officer chased the individuals and apprehended Robert Lake, who was taken into custody for questioning. Although Lake initially blamed Nixon for Collins's disappearance, within hours, Lake "had admitted to killing Mr. Collins and putting his body up in the Patrick Creek area." Lake made statements further implicating Nixon in the homicide and proceeded to show Wardensky where Collins's body was located.

¶3     In the early hours of April 18, Nixon's father was driving Nixon home from his older brother's bachelor party. During the party, which lasted approximately seven hours, Nixon estimated he consumed about ten drinks. On their way home, Nixon and

2

his father were stopped by four law enforcement officers who, with weapons drawn, detained the two and then transported Nixon to the Kalispell Police Station for questioning.[1] An arresting officer informed Nixon during transport that he had been arrested on two outstanding misdemeanor warrants; he was not informed that he was the subject of a homicide investigation.

¶4 Nixon arrived at the police station at 4:30 a.m. and was given a copy of his outstanding warrants. All movements and statements he made at the station were videotaped by Kalispell police. At first, Nixon was left alone in the booking area of the station for approximately two hours, during which time he slept on a bench. Just prior to 7:00 a.m., Sergeant Wardensky woke Nixon up and began to interview him. Wardensky asked Nixon if he had been drinking; Nixon admitted that he had had "quite a bit" to drink. Wanting to ensure that Nixon was not incapacitated, Wardensky asked Nixon to provide a breath sample on a portable breath testing device. The test showed Nixon's blood alcohol content to be .08. Wardensky then told Nixon that what he would like to do is "visit with you a little bit about something that I've been looking at and working on, starting yesterday morning I guess." First, however, Wardensky asked Nixon a series of general questions about where he lived, the bachelor party he had attended, and his brother's impending wedding.

¶5 Wardensky then read Nixon his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), as provided on the Kalispell Police Department's "YOUR

---

[1] The basis for the traffic stop is not at issue on appeal.

RIGHTS" form. The following dialogue occurred immediately after Wardensky read

Nixon his rights:

| | |
|---|---|
| NIXON: | Just a slight question. |
| WARDENSKY: | Sure. |
| NIXON: | Why did you ask me questions before you read me my rights? |
| WARDENSKY: | Um… |
| NIXON: | I was just curious… |
| WARDENSKY: | Curious, and, and ah, I would be happy to answer that. Because, uh, I wanted to see what your cognitive process is, ya know, and ah, given the fact that you've had a little bit to drink tonight, I wanted to see if, you know, if you could answer a few questions, and ah, you know, and see if things are cooking up seriously upstairs for ya. They seem to be, so. Okay does that answer that for ya? |
| NIXON: | Yeah. |
| WARDENSKY: | Okay, do you want to talk to me? |
| NIXON: | There isn't really anything to talk about. |
| WARDENSKY: | Well, I've got a bunch. |
| NIXON: | I'm tired. I've been up since six yesterday morning and I've been sitting here for a while. |
| WARDENSKY: | Well that's pretty ironic, so have I. |
| NIXON: | Yeah, if I was you I would be home sleeping… |
| WARDENSKY: | Well, hopefully that'll be the case here shortly. |
| NIXON: | I sure hope so, I've got a wedding here in a couple of hours. |
| WARDENSKY: | Yeah. So, you interested in talking with me Jeff? |
| NIXON: | I really don't have anything to talk about. I was told I was brought in here on traffic tickets, but one of 'ems a traffic ticket, the other one's a theft. I don't really have anything to talk about. |
| WARDENSKY: | Okay. Well, there's a little more to it than that and that's what I would like to talk to you about. |
| NIXON: | Talk away, sir. |
| WARDENSKY: | Okay. Um, one of the things that I would like to do Jeff, is ah, get a signature from you and all that, that says I read this to you and you understand, okay? You wanna hop up here and sign that for me? |
| NIXON: | Do I get to read it first. |

WARDENSKY:      Absolutely, here you go.
NIXON:              (Reads and signs paper.)[2]

¶6      After Nixon read and signed the statement identifying his *Miranda* rights, signaling that he understood those rights and was willing to talk to law enforcement, Wardensky began to ask him general questions about Robert Lake and Wesley Collins. Although initially Nixon stated that he had had limited contact with Collins, eventually he explained that he had smoked marijuana with Collins on several occasions. Wardensky then informed Nixon that the Kalispell Police Department had received a missing person's report regarding Collins. Nixon did not invoke his right to remain silent at that point, and instead answered Wardensky's questions about when he last had seen Collins. Wardensky then "cut to the chase," told Nixon he knew "Wes is dead" and informed Nixon that he was conducting a homicide investigation. Nixon did not invoke his right to remain silent at that point, but continued to answer Wardensky's questions about the events surrounding Collins's death.

¶7      On April 22, 2010, the Flathead County Attorney filed an information charging Nixon with causing the death of Wesley Collins. The county attorney later filed an

---

[2] The Kalispell Police Department "YOUR RIGHTS" form reads as follows:
> You have the right to remain silent. Anything you say can and may be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
>
> Do you understand each of these rights I have explained to you and having these rights in mind, do you wish to talk to us now?

amended information charging Nixon with the following felony offenses: (1) Accountability for Deliberate Homicide in violation of §§ 45-2-302(3) and 45-5-102(1)(a), MCA, and, in the alternative, Deliberate Homicide, in violation of § 45-5-102(1)(b), MCA; (2) Robbery, in violation of § 45-5-401(1)(a), MCA; (3) Tampering with Physical Evidence, in violation of § 45-7-207(1)(a), MCA; and (4) Burglary, in violation of § 45-6-204(1)(b), MCA.

¶8 Nixon filed a motion to suppress statements he made during his interview with Sergeant Wardensky. The District Court held a hearing on the matter on September 17, 2010. Both Nixon and Wardensky testified. The court viewed portions of the videotaped interview and admitted several pages of a transcript of the interview into evidence. Nixon also testified; he stated that he understood his *Miranda* rights during the interview and acknowledged that he never specifically told Wardensky that he did not want to talk to him, although he did say that he did not really have anything to talk about. After the hearing, the District Court denied Nixon's motion to suppress. The court found that Nixon voluntarily agreed to answer Wardensky's questions and further concluded that Nixon "did not unambiguously invoke his right to remain silent and in fact, when he directs the officer to 'talk away' he appears to be agreeing to answer questions."

¶9 Nixon's trial began on July 11, 2011. Several of Nixon's acquaintances testified against him, including some who had been charged in connection with Collins's death. Nixon also testified on his own behalf. The trial testimony established that Collins lived upstairs from Lake and his girlfriend and that Nixon, Lake and Collins had smoked

6

marijuana together on occasion. Testimony showed that, on April 12, 2010, Collins invited Nixon and Lake into his apartment to smoke marijuana. While they were smoking, Lake knocked Collins unconscious by striking him in the head with a claw hammer. Lake then told Nixon to shut the blinds in the apartment and check whether Collins's marijuana plants were budding; Nixon followed Lake's directions. When Collins began to regain consciousness, Lake responded by striking him with another hammer and eventually proceeding to strangle him with string.

¶10 After Collins was dead, Nixon left the apartment to purchase cigarettes at a nearby gas station. He acknowledged at trial that he could have called the police at this point, but he chose not to. Instead, he returned to the apartment complex and played an integral role in disposing of Collins's body.

¶11 Nixon told Lake that they should dump Collins's body at Patrick Creek, a remote area in the mountains. Nixon borrowed a truck from a friend to transport the body. Then he, Lake, and Lake's friend wrapped Collins's body in blankets and threw it out the window. Nixon drove the truck to the back of the apartment and the trio loaded Collins's body into the truck bed. Nixon drove to Patrick Creek, where they dumped the body. The next morning, Nixon attempted to drive back to Patrick Creek to pour lye on Collins's body, but he was unable to reach the body because it had snowed that night.

¶12 The State did not introduce the video of Wardensky's interview with Nixon as evidence or play it for the jury. The State points out that the only time it referenced the interview in its case-in-chief was during its direct examination of Wardensky:

7

Q. Jim, let's talk about the interview of the Defendant. When you were interviewing Mr. Nixon did he admit to being a lookout?
A. Yes.
Q. Did he admit to taking anything?
A. Yes, he did.
Q. What did he admit to taking?
A. Marijuana.

In addition, the State used statements from the interrogation in cross-examining Nixon.

¶13 After deliberating for over four hours, the jury found Nixon guilty of robbery, accountability for deliberate homicide, tampering with physical evidence, and burglary. The District Court subsequently committed Nixon to the Montana State Prison for a net sentence of 100 years.

¶14 Nixon argues that his conviction should be reversed and a new trial granted because of the District Court's refusal to suppress statements he made during his custodial interrogation.

**STANDARD OF REVIEW**

¶15 When reviewing a district court's ruling on a motion to suppress, we "determine whether the findings of fact are clearly erroneous and whether the court correctly interpreted the law and applied it to those facts." *State v. Haldane*, 2013 MT 32, ¶ 15, 368 Mont. 396, ____ P.3d _____ (citing *State v. Anders*, 2012 MT 62, ¶ 9, 364 Mont. 316, 274 P.3d 720). A factual finding is clearly erroneous if it is "not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with a definite or firm conviction that a mistake has been made." *State v. Morrisey*, 2009 MT 201, ¶ 14, 351 Mont. 144, 214 P.3d 708.

8

**DISCUSSION**

¶16 *Whether the District Court erred in denying Nixon's motion to suppress statements he made during his custodial interrogation with Sergeant Wardensky.*

¶17 No person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment's Self-Incrimination Clause applies to the States through the Fourteenth Amendment's Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 6-11, 84 S. Ct. 1489, 1492-95 (1964). The Montana Constitution similarly provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding." Mont. Const. art. II, § 25.

¶18 This privilege against self-incrimination is "available outside of criminal court proceedings and serves to protect persons 'in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.'" *Morrisey*, ¶ 27 (quoting *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624). Because the modern practice of custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the Supreme Court has established "concrete constitutional guidelines" for law enforcement agencies to follow. *Miranda*, 384 U.S. at 467, 442, 86 S. Ct. at 1624, 1611. When a person "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," he "'must be adequately and effectively apprised of his rights and the

9

exercise of those rights must be fully honored.'" *Morrisey*, ¶ 28 (quoting *Miranda*, 384 U.S. at 478, 467, 86 S. Ct. at 1630, 1624).

¶19 These rights, commonly known as *Miranda* rights, mandate that before a person may be subjected to a custodial interrogation, "he 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Morrisey*, ¶ 28 (quoting *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630). Failure by law enforcement officers to give these warnings and obtain a waiver of rights prior to a custodial interrogation "generally requires exclusion of any statements obtained." *Morrisey*, ¶ 28.

¶20 There is no dispute in this case that Nixon was subjected to a custodial interrogation when he was interviewed by Sergeant Wardensky at the police station. *See State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364. Nixon does not assert that Sergeant Wardensky failed to read the aforementioned *Miranda* rights prior to questioning him. The video recording of Nixon's interview reveals that Wardensky read the *Miranda* warnings to Nixon and provided him with a written copy of his rights, which Nixon read and signed. At the suppression hearing, Nixon testified that he understood each of those rights. Nixon contends, instead, that he invoked his right to remain silent or, in the alternative, that he did not voluntarily waive his rights. For those reasons,

10

Nixon alleges, the District Court erred when it failed to suppress the statements he made to Wardensky.

### A. Whether Nixon invoked his right to remain silent.

¶21    Nixon contends that he "attempted to invoke his *Fifth Amendment* right to remain silent when he said three separate times: 'I don't really have anything to talk about.'" The State responds that Nixon did not articulate a desire to remain silent "sufficiently clearly that a reasonable officer in the circumstances would have understood Nixon's statements to be an invocation of his *Miranda* right to remain silent" as required by the Supreme Court in *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250 (2010).

¶22    In *Berghuis*, Van Chester Thompkins was arrested as a suspect in a shooting and subjected to a custodial interrogation. *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2256. At the beginning of the interrogation, officers read Thompkins his *Miranda* rights and presented him with a form explaining those rights. Thompkins refused the officers' request to sign the form to demonstrate that he understood his rights, but the officers nonetheless began to interrogate him. At no point during the interrogation, which lasted about three hours, did Thompkins say that he wished to remain silent. He was "'largely' silent" during the interrogation, but he did provide some limited verbal and nonverbal interaction with his interrogating officers. *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2256.

¶23    After two hours and forty-five minutes of questioning, a police officer asked Thompkins whether he believed in God and whether he prayed to God. Thompkins said "yes" in response to both questions. The officer then asked Thompkins whether he had

11

asked God to forgive him for "shooting that boy down"; Thompkins again said "yes." *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2257. The district court denied Thompkins's motion to suppress statements he made during the interrogation and, after a jury trial, he was found guilty of first-degree murder. *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2257-58.

¶24 On appeal, the Supreme Court was asked whether Thompkins had invoked his right to remain silent "by not saying anything for a sufficient period of time." *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2259. Although it had not yet stated "whether an invocation of the right to remain silent can be ambiguous or equivocal," the Court found "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue" in *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350 (1994). *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2260. The Court noted that in *Davis* it had held that if an accused "makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation. . . ." *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2259-60 (quoting *Davis*, 512 U.S. at 461-62, 114 S. Ct. at 2355). Because Thompkins did not unambiguously and unequivocally state that he did not wish to talk to the police, the Court held that he did not invoke his right to remain silent. *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2260.

¶25 Nixon attempts to distinguish his case from *Berghuis* on the grounds that Nixon actually invoked his right to remain silent whereas Thompkins did not, and urges the

12

Court not to adopt *Berghuis* in any event. Nixon argues that the Montana Constitution should be construed to provide broader protection of the right against self-incrimination. He contends that his statements, "I don't really have anything to talk about," invoked his right to remain silent.

¶26 We are not bound by decisions of the U.S. Supreme Court "where independent state grounds exist for developing heightened and expanded rights under our state constitution." *Butte Community Union v. Lewis*, 219 Mont. 426, 433, 712 P.2d 1309, 1313 (1986). When a party urges us to recognize expanded rights under the Montana Constitution, that party bears the burden of proving "that a unique aspect of the Montana Constitution, or the background material related to the provision, provides support for the greater protection that he seeks to invoke." *State v. Covington*, 2012 MT 31, ¶ 21, 364 Mont. 118, 272 P.3d 43. A party may satisfy this burden in at least one of three ways: by "identify[ing] unique language within the Montana Constitution" dictating enhanced protection; by "referenc[ing] Constitutional Convention transcripts and committee reports" showing that the delegates intended to provide greater protection; or by establishing that the right alleged "must be read in conjunction with" other specified rights unique to the Montana Constitution. *State v. Myran*, 2012 MT 252, ¶ 25, 366 Mont. 532, 289 P.3d 118 (citing *Covington*, ¶ 21).

¶27 Nixon has not identified any language unique to the Montana Constitution or cited to any references from Montana's Constitutional Convention that suggest the right to remain silent in Article II, Section 25 provides greater protections than the same right

13

provided by the United States Constitution. Consequently, he has the burden of demonstrating that the right to remain silent, when read in conjunction with other unique rights guaranteed by the Montana Constitution, must take on broader meaning. *Myran*, ¶ 25. For example, when the right to be free from unreasonable searches and seizures found in Article II, Section 11 of the Montana Constitution is read together with the Article II, Section 10 right of privacy, it provides greater protections than the Fourth Amendment's right against unreasonable searches and seizures. *State v. Bullock*, 272 Mont. 361, 383-85, 901 P.2d 61, 75-76 (1995). Article II, Section 10, enhances the protection because "there is no similar textual language in the United States Constitution and we have therefore recognized that this section grants rights beyond that inferred from the United States Constitution." *Bullock*, 272 Mont. at 383, 901 P.2d 61, 75. Similarly, when the Article II, Section 22 prohibition against cruel and unusual punishments is read together with the Article II, Section 4 right of individual dignity, it "provide[s] Montana citizens greater protections from cruel and unusual punishment than does the federal constitution" because the federal constitution "does not expressly provide for the right to human dignity." *Walker v. State*, 2003 MT 134, ¶ 73, 316 Mont. 103, 68 P.3d 872.

¶28    We decline Nixon's invitation to read protections into Article II, Section 25's right to remain silent that are greater than those found in the Fifth Amendment of the United States Constitution. He contends that the Montana Constitution's right to remain silent must be read together with its right to counsel in custodial interrogations to provide additional protections to individuals invoking their right to not speak with law

14

enforcement officers. But the right to counsel during custodial interrogation also is rooted in the Fifth Amendment. *State v. Scheffer*, 2010 MT 73, ¶ 17, 355 Mont. 523, 230 P.3d 462; *Miranda*, 384 U.S. at 469-70, 86 S. Ct. at 1625-26; *McNeil v. Wis.*, 501 U.S. 171, 176-78, 111 S. Ct. 2204, 2208-09 (1991). We have in fact interpreted that right consistent with the principles articulated in *Davis*. That is, "if a suspect makes a reference to an attorney that is ambiguous or equivocal, in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, the officer is not required to cease questioning." *Scheffer*, ¶ 31. We also applied *Davis* to assertion of the right to counsel in *State v. Main*, 2011 MT 123, ¶¶ 17-19, 360 Mont. 470, 255 P.3d 1240 (affirming the district court's determination that Main "did not clearly or unequivocally request a lawyer"). The right to counsel during custodial interrogations is not unique to Montana's constitution; the right to remain silent, therefore, is not enhanced by reading the two together. *Myran*, ¶¶ 25-26.

¶29 Nixon's contention that we should not require that a suspect unambiguously and unequivocally invoke his or her right to remain silent finds little support in our recent opinions on the right to remain silent. In *State v. Morrisey*, decided prior to *Berghuis*, the State argued that a suspect's "invocation of his right to remain silent was invalid because it was ambiguous or equivocal." *Morrisey*, ¶ 39. We noted that "the Supreme Court has not yet directly addressed whether [*Davis*] applies to the right to remain silent." *Morrisey*, ¶ 39. Assuming *arguendo* that a person in custody must invoke his right to remain silent "'sufficiently clearly that a reasonable police officer in the circumstances

15

would understand the statement to be' an assertion of the right," *Morrisey*, ¶ 39 (quoting *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355), we noted that the critical question is whether the suspect's "right to cut off questioning was 'scrupulously honored.'" *Morrisey*, ¶ 34 (quoting *Mich. v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 326 (1975)). Although Morrisey's pre-*Miranda*-waiver statement that "I ain't saying nothing" constituted an assertion of his right to remain silent, we determined that once the formal interview began, Morrisey voluntarily changed his mind and spoke freely with the interrogating officers. *Morrisey*, ¶¶ 40, 43-44.

¶30 In *State v. Jones*, we concluded that "Jones's statements that he was 'through talking' [did] not constitute an unequivocal invocation of his right to counsel *or to remain silent* on the facts of this case" and, therefore, he did not invoke those rights. *State v. Jones*, 2006 MT 209, ¶ 27, 333 Mont. 294, 142 P.3d 851 (emphasis added).

¶31 Finding no basis in Montana's Constitution or our prior case law for an expanded right against self-incrimination, we now adopt *Berghuis* and its application of the *Davis* standard to a suspect's invocation of the right to remain silent. Like the Supreme Court, we hold that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis*, ___ U.S. at ___, 130 S. Ct. at 2260. Although there are no "talismanic phrases or any special combination of words" required to invoke one's right to remain silent, *Morrisey*, ¶ 40 (quoting *U.S. v. Ramirez*, 79 F.3d 298, 304 (2d. Cir. 1996)), a suspect must articulate his desire to remain silent "sufficiently clearly that a

16

reasonable police officer in the circumstances would understand the statement to be a request" to not speak with the police. *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355 (citations omitted). If the suspect does not unambiguously and unequivocally invoke his right to remain silent in this manner, then the interrogating officers are not required to stop questioning the suspect pursuant to Article II, Section 25 of the Montana Constitution. *See Davis*, 512 U.S. at 459, 114 S. Ct. at 2355. We apply this standard to the facts presented by Nixon.

¶32 Whether a suspect invokes his right to remain silent "is an objective inquiry." *Morrisey*, ¶ 40. In making this inquiry, we do not merely look to specific passages from a transcript in isolation; we "also consider the circumstances in which the statement was made." *Scheffer*, ¶ 29 (quoting *U.S. v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009)).

¶33 When Nixon was arrested, police advised him that he was being held on two outstanding misdemeanor warrants and gave him paperwork detailing those warrants. When Wardensky first asked Nixon if he wanted to talk to him, Nixon replied: "There isn't really anything to talk about." Moments later, when Wardensky again asked Nixon if he would be willing to speak with the police, Nixon replied: "I really don't have anything to talk about. I was told I was brought in here on traffic tickets, but one of 'em's a traffic ticket, the other one's a theft. I don't really have anything to talk about."

¶34 Given this context, a reasonable police officer in the circumstances would understand Nixon's statements to mean that the outstanding warrants were self-explanatory and did not provide a sufficient topic of conversation. Once Wardensky

17

provided Nixon with a topic of conversation—"there's a little more to it than [the misdemeanor warrants] and that's what I would like to talk to you about"—Nixon affirmatively agreed to speak with the police, stating, "talk away sir," and signing the waiver of rights form. Wardensky's clarification was appropriate. We have held that to the extent they believe a suspect's statement to be ambiguous or equivocal, it is "'good police practice' . . . [for police officers to ask questions] to clarify whether or not the suspect is actually invoking his *Miranda* rights." *Morrisey*, ¶ 41 n. 8 (citing *Davis*, 512 U.S. at 461, 114 S. Ct. at 2356). Asking these clarifying questions protects the constitutional rights of the suspect and minimizes "the chance of a confession being suppressed due to subsequent judicial second-guessing . . . ." *Morrisey*, ¶ 41 n. 8 (citing *Davis*, 512 U.S. at 461, 114 S. Ct. at 2356). Once Wardensky advised Nixon that there was more to talk about than the traffic citations, Nixon invited additional discussion. The District Court's finding that Nixon "did not unambiguously invoke his right to remain silent" is supported by substantial credible evidence. Once Nixon had signed the waiver of rights form and Sergeant Wardensky began discussing Collins's death, Nixon spoke freely. As in *Morrisey*, Nixon's right to cut off questioning was not infringed. *See Morrisey*, ¶ 44.

*B. Whether Nixon voluntarily waived his* Miranda *rights.*

¶35 In the alternative, Nixon argues that even if he did not invoke his right to remain silent, he did not waive his *Miranda* rights in a knowing, voluntary, and intelligent manner. Any waiver he made was constitutionally-deficient, he alleges, because he was

18

psychologically coerced, he was intoxicated, he had slept for only two hours that night, the waiver form he signed was confusing, and Sergeant Wardensky initially misled him about the scope of his custodial interrogation. The State counters by asserting that, under the totality of the circumstances, the District Court correctly concluded that Nixon made a valid waiver of his rights.

¶36 A suspect may waive his *Miranda* rights provided that the waiver "is made voluntarily, knowingly, and intelligently." *Main*, ¶ 21. This is a two-dimensional inquiry. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Main*, ¶ 21 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986)). Second, the waiver must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Main*, ¶ 21 (quoting *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141).

¶37 A court's inquiry into whether a waiver was voluntary under the totality of circumstances is factual in nature. *State v. Hoffman*, 2003 MT 26, ¶ 19, 314 Mont. 155, 64 P.3d 1013. This requires consideration of "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused" as well as the "age, education, and intelligence of the accused, and his capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Main*, ¶ 21 (quoting *State v. Blakney*, 197 Mont. 131, 138, 641 P.2d 1045, 1049 (1982)). Furthermore, a statement "extracted by any sort

19

of threat or violence, by the exertion of any improper influence, or by any direct or implied promises, however slight, has the potential for being involuntary." *Hoffman*, ¶ 19. A court properly may conclude that a suspect has waived his or her *Miranda* rights "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension." *Main*, ¶ 21 (quoting *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141).

¶38 The District Court found that, "[a]t the time of the interview[,] [Nixon] was 18 years of age, had completed the 12th grade and graduated from high school, had no difficulty reading, no difficulty with English, and was familiar with the Miranda advisement." After viewing a video of Nixon's interactions with Sergeant Wardensky, the District Court further found:

> The Defendant's questions and responses clearly indicate that he understood the questions, the procedure, and that he had the ability to engage in meaningful conversation with the officer. He earlier in the evening had reviewed the 2 outstanding warrants and some hours later was able to indicate that both were not for traffic tickets and in fact one was for theft. This again clearly indicates that he was able [to] read, process and understand what he read, [including] the Miranda form which he signed.

After analyzing the totality of the circumstances, the District Court concluded that Nixon waived his *Miranda* rights in a knowing, intelligent, and voluntary manner. We find no error in this conclusion.

¶39 Nixon first claims that any waiver he made was involuntary because he was intoxicated and sleep-deprived at the time he was interviewed. Wardensky knew Nixon's blood alcohol content was .08, so he asked Nixon various background questions to

20

determine whether he was lucid enough to submit to a custodial interrogation. Wardensky was satisfied with Nixon's answers, and there is no indication that Nixon did not understand the questions or otherwise was incapacitated by intoxication. Although he testified at the suppression hearing that he had difficulty focusing on the written copy of his rights, he did not tell this to Wardensky during the interrogation and it is not apparent when viewing the videotaped interrogation.

¶40 We have determined that a suspect's waiver of *Miranda* rights was valid even though he had consumed alcohol within six hours of his interrogation, he "smelled of alcohol and occasionally slurred his words." *Main*, ¶ 23. Our decision was guided by the fact that, like Nixon, the suspect in *Main* "wasn't stumbling" and he "answered questions in an articulate manner." *Main*, ¶ 23. Similarly, we have cited with approval a case from the Court of Appeals for the Eighth Circuit where a suspect validly waived his *Miranda* rights even though he recently had used methamphetamine and had not slept in five days, but was able to converse coherently with law enforcement officers. *Hoffman*, ¶ 26 (citing *U.S. v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990)). The videotaped interrogation undermines Nixon's contention that he was too intoxicated and sleep-deprived to understand what was happening; instead, he interrupted to seek clarification when he wanted it and answered Wardensky's questions in a clear, coherent manner. *See State v. Cassell*, 280 Mont. 397, 403, 932 P.2d 478, 481-82 (1996).

¶41 Nixon also claims that, because he was arrested at gunpoint, he was intimidated and psychologically coerced. A suspect's statement "extracted by any sort of threat or

violence . . . has the potential for being involuntary." *State v. Loh*, 275 Mont. 460, 476, 914 P.2d 592, 602 (1996). While it is true that Nixon was arrested at gunpoint, the custodial interrogation took place nearly four hours after Nixon's arrest. Sergeant Wardensky did not threaten Nixon or psychologically coerce him at any time during his questioning. Nixon's claim on this point is without merit.

¶42 Nixon next claims that his waiver of *Miranda* rights was involuntary because the "YOUR RIGHTS" form he signed, which presented each of his rights in writing, was confusing. When a suspect is presented with a waiver form that is "erroneous, intimidating and virtually indecipherable," a suspect cannot "enter into a knowing, intelligent or voluntary waiver" of his *Miranda* rights. *State v. Mann*, 2006 MT 33, ¶ 24, 331 Mont. 137, 130 P.3d 164. In *Mann*, the waiver form the police presented to the suspect for signature contained incorrect legal statements and was worded in such a way that it was confusing and difficult to understand. *Mann*, ¶¶ 23-24.

¶43 Nixon does not allege that the form he signed contained legal errors, instead, he alleges that the waiver form is "indecipherable" because it does not contain the word "waiver" and because "the last sentence is a compound sentence." His assertion that the form was confusing is belied by his testimony at the suppression hearing, where he stated that he understood each of his *Miranda* rights after Wardensky read the waiver form to him. His argument on this point lacks factual basis and is without merit.

¶44 Finally, Nixon argues that Wardensky deceived him by "misleading Mr. Nixon to believe that he was brought in for misdemeanor charges alone." Without citing any

22

authority, he contends that, "[a]fter Wardensky gave [him] this false impression, [he] could no longer make a knowing, intelligent and voluntary decision to waive his *Miranda* rights." Nixon's claim that Wardensky said he was being questioned only because of misdemeanor charges is incorrect. Before he read Nixon the *Miranda* warnings, Wardensky told Nixon that he would like to "visit with you a little bit about something that I've been looking at and working on, starting yesterday morning I guess." Although Wardensky did not inform Nixon that he was the subject of a homicide investigation, that does not render Nixon's waiver involuntary. The United States Supreme Court "has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights[.]" *Colo. v. Spring*, 479 U.S. 564, 576, 107 S. Ct. 851, 858 (1987).

¶45 The totality of the circumstances supports the District Court's finding that Nixon's waiver of his *Miranda* rights was voluntary, knowing and intelligent. Nixon was an eighteen-year-old man of normal intelligence who received a complete and timely *Miranda* warning. He signed the Kalispell Police Department form explaining those rights; his signature indicated that he understood his rights and was willing to talk to the police. Nixon later testified at the suppression hearing that he understood each of his rights after Wardensky read them to him. Nixon then waived his right to remain silent by answering Wardensky's questions. There is no evidence in the record of any coercive or other improper conduct by the police that would render Nixon's waiver involuntary. In fact, Nixon cannot point to any moment during the custodial interrogation when his state

23

of intoxication, his lack of sleep, the supposed psychological coercion he experienced, or the confusing waiver form actually affected his ability to voluntarily, knowingly, and intelligently waive his *Miranda* rights. *See Hoffman*, ¶ 28. We conclude that the District Court's finding that Nixon's *Miranda* waiver and subsequent statements to the police were voluntary was supported by substantial credible evidence and its conclusions of law were correct. *Main*, ¶ 24.

¶46 The District Court correctly denied Nixon's motion to suppress. The judgment is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON