FILED

04/20/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0062

DA 19-0062

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 96N

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

FRANK MACIEL,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 18-110
Honorable Karen S. Townsend, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney, Brittany L. Williams, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  February 24, 2021

Decided:  April 20, 2021

Filed:

                    _____
                             Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of non-citable cases published in the Pacific Reporter and Montana Reports.

¶2 Frank Maciel appeals from the August 20, 2018 Order of the Fourth Judicial District Court, Missoula County, denying his motion to suppress his statements to police as involuntarily given. Alternatively, he seeks amendment of his sentence to reflect the District Court's oral modification of a probation condition.

¶3 The Missoula Police Department received a report of a robbery incident that occurred in the area of the California Street Bridge the night of June 17, 2017. The male victim stated that two men had assaulted him, taken some money, and left him with injuries, including a broken jaw, broken cheek bone, and a concussion. Although unknown to him, the victim gave a detailed description of the two attackers, and Missoula Detective Guy Baker was able to identify one of them, based in part on a large tattoo of the State of California on his right cheek, as Christopher Brandon. Baker interviewed Brandon, who provided details about the incident and identified the second attacker as Maciel.

¶4 On August 22, 2017, Baker and FBI Special Agent Monte Shaide met with and interviewed Maciel at the Great Falls Detention Center, where Maciel had been detained since July 5 on a probation violation. Prior to this meeting, a Great Falls detective had

2

been sent to speak with Maciel regarding the case, but the record does not indicate what was discussed between Maciel and the detective at that time.

¶5    The officers read a Miranda advisory, and Maciel acknowledged his understanding of his rights. He signed a waiver and consented to speak with the officers. He initially denied being in Missoula on the evening of the attack, but eventually acknowledged he had been there, remembering the day as the one he had skipped a scheduled appointment with his probation officer. He indicated he was a Facebook friend with Brandon, who he referred to as "Paco." He initially maintained he didn't "[know] anything about this, about that dude getting beat," but eventually conceded "I coulda hit him" because "I am a violent person when I get high and drunk," and that "I've been getting' high and drunk all the time." Later, Maciel stated, "I kinda remember some of this, but now it's startin' to come, (inaudible) I think I did assault this guy. . . . I remember him having money." Maciel explained the victim had approached Maciel and pulled out money to get Maciel to sell him some marijuana, at which point Maciel had hit him several times and taken his money. Showing to the officers cut marks on his hand sustained when hitting the victim, which the officers photographed, Maciel stated:

> I did it. I fuckin' did it, I know what happened. Paco isn't involved in this. I was the one who assaulted him. I didn't have no club or whatever the fuck he, I used my hand. I got, I got, my hands are registered as MMA fightin', I fight, like, quite a bit out there on the streets if someone fight, fucks with me I got a solid punch. He had glasses on that day when I punched him, that's why he has this supposedly, um a cut, cause I remember I cut my hand right here, right here, and probably right here from his glasses.

3

¶6 Maciel was charged with felony robbery pursuant to § 45-5-401, MCA, and filed a motion to suppress his confession, claiming police had conducted a coercive interview, that he had a mental health diagnosis, and that police had failed to honor his request to cease the interrogation. The District Court reviewed the recording of the interview and a 2015 social assessment completed on Maciel at the Montana State Hospital in an earlier case. The District Court found from the evaluation that, although Maciel was diagnosed with a moderate intellectual disability, Maciel understood what he was charged with, the gravity of the offenses, the roles of the participants in the process, and that "he could adequately communicate with his defense attorney." The evaluation concluded that Maciel was fit to proceed. The court found by a preponderance of the evidence that Maciel had spoken to the officers voluntarily, and reasoned as follows:

> Throughout the interview, neither Detective Baker or Agent Shaide raise their voices toward the Defendant. Their tone in not harsh or threatening. Although at times the Defendant becomes slightly emotional and even cries at one point, that episode does not last long. Although the Defendant says more than one time, things like or similar to: "I'll plead out if I have to" or "I'll plead to something I didn't do," after each such comment, Detective Baker says that he doesn't want him to plead to something he did not do, but rather, "No, I just want you to be honest." The Court is unable to find in either the transcript of the interview or in the audio recording anything that amounts to a promise of leniency, a threat, or any deception on the part of the two officers.

Regarding his claim that officers failed to honor his request to cease the interrogation when he made statements such as, "I just want to get the fuck outta here dude, that's what I'm sa, seriously, this is stressin' me out," the District Court held:

> The Court does not conclude that the Defendant unambiguously exercised his right to remain silent. Although he does not have to speak as an

4

Oxford don, a Defendant must at least speak as did the Defendant in *Morrisey*, supra. "I ain't saying nothing." Other unambiguous examples quoted in *Morrisey* are: "I got nothing to say"[,] *State v. Szpyrka*, 202 P.3d 524 (Ariz. App. 2d Div. 2008), "I ain't got nothin' to say", *People v. Carey*, 227 Cal. Rptr. 813 (Cal. App. 2d Dist. 1986), "No quiero declarer nada," or "I don't want to declare" *Cuerro v. State*, 967 So. 2d 155 (Fla. 2007), or "I don't have anything to say", *State v. Crump*, 834 S.W. 2d 265 (Tenn. 1992).

The Defendant in this case does not make any sort of unambiguous statement that he wants to remain silent. His expressions of wanting to get out of there is not clearly a statement of wanting to remain silent. The statement is equally a statement of wanting to get out of custody. This Court cannot conclude that the Defendant made an unambiguous statement of wishing to remain silent that Detective Baker and Agent Schaid refused to honor.

¶7 After providing a detailed analysis of the transcribed interview, the District Court denied the motion. Pursuant to a plea agreement, Maciel entered a no contest plea and reserved his right to appeal the denial of his motion to suppress. The District Court sentenced Maciel to ten years in the Montana State Prison with five years suspended, with various conditions to his suspended sentence. Maciel appeals.

¶8 When reviewing a district court's decision on a motion to suppress, we apply the clearly erroneous standard to findings of fact and de novo review when determining whether the findings are correctly applied as a matter of law. *State v. Eskew*, 2017 MT 36, ¶ 12, 386 Mont. 324, 390 P.3d 129; *State v. Nixon*, 2013 MT 81, ¶ 15, 369 Mont. 359, 298 P.3d 408; *State v. Morrisey*, 2009 MT 201, ¶ 14, 351 Mont. 144, 214 P.3d 708. We do not reweigh evidence considered by the district court or substitute our own evaluation of that evidence. *Eskew*, ¶ 12 (citing *State v. Old-Horn*, 2014 MT 161, ¶¶ 13-14, 375 Mont. 310, 328 P.3d 638). While it is true that whether a confession is voluntary is a factual issue and the district court is in the best position to determine the credibility of witnesses who

5

testify, *Eskew*, ¶ 12, "nothing in our case law requires this Court to simply disregard" tape recorded evidence of the confession, particularly when the lower court's finding is clearly erroneous. *City of Missoula v. Metz*, 2019 MT 264, ¶ 30, 397 Mont. 467, 451 P.3d 530.

¶9 The Fifth Amendment of the Constitution of the United States of America, applicable to the States through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also* Mont. Const. art. II, § 25. Prior to a custodial interrogation, a suspect must be informed that "he has the right to remain silent, that anything he says can and will be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). Law enforcement must obtain a waiver of these rights before proceeding with questioning. *Morrisey*, ¶ 28. A waiver may be withdrawn at any time, because "'[o]pportunity to exercise these rights must be afforded'" to the defendant throughout the interrogation. *Morrisey*, ¶ 28 (quoting *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630). The exercise of the right to remain silent, whether immediate or after the interrogation has begun, must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 326 (1975); *Morrisey*, ¶ 38. Whether the right to silence was exercised is an objective inquiry. *Morrisey*, ¶ 40.

¶10 It is undisputed here that the interview was a custodial interrogation, that Maciel was advised of his *Miranda* rights, and that he waived them. As he did in the District

Court, Maciel argues his confession was involuntary under the totality of the circumstances, that he suffers from an intellectual disability and his will is easily overborne, and that officers failed to honor "his desire to end his custodial interview."

¶11 "[T]he essential inquiry under the due process voluntariness test is whether the suspect's will was overborne by the circumstances surrounding the giving of the confession." *Morrisey*, ¶ 47 (citing *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 2330-31 (2000)). This determination is made following a review of the "totality of the circumstances." *State v. Loh*, 275 Mont. 460, 475, 914 P.2d 592, 601 (1996). The factors that affect this analysis are numerous and include:

> the defendant's age and level of education; the interrogation technique used by the police; whether the defendant was advised of his or her *Miranda* rights; the defendant's prior experience with the criminal justice system and police interrogation; the defendant's background and experience; and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties.

*Loh*, 275 Mont. at 475-76, 914 P.2d at 601-602. This is a nonexclusive list, with other factors being considered, such as the defendant's mood or education, the use of psychological pressure, the length and location of the questioning, the coercive nature of the setting and questioning, lying to the suspect about what is known about their level of involvement, whether the interrogation was conducted under the assumption of guilt, and whether the confession was the product of lies, promises, or threats of violence by the interrogator. *Eskew*, ¶¶ 17-18 (citations omitted); *Morrisey*, ¶ 47 (citations omitted). Consideration of the totality of the circumstances is a holistic review and "no single factor

7

controls." *Eskew*, ¶ 17 (citing *State v. Grey*, 274 Mont. 206, 210, 907 P.2d 951, 954 (1995)).

¶12     Maciel's interrogation was not lengthy, running about 50 minutes, which is significantly shorter than other interrogations we have upheld. *See, e.g.*, *Morrisey*, ¶ 48 (five to six hours split between two separate sessions); *State v. Reavley*, 2003 MT 298, ¶ 7, 318 Mont. 150, 79 P.3d 270 (approximately four and one-half hours). Maciel was 27 years old and, as the District Court noted, was not deprived of sleep or food. The District Court found that the officers had not employed "impermissible psychological techniques," had used tones that were "not harsh or threatening," and that "[t]he bulk of the interview was an attempt to clarify what the Defendant was saying, or probe what he did or did not remember after he admitted to being in Missoula." The District Court found that the officers did not suggest certain facts that Maciel then recited back, noting that "[a]t no time before [Maciel] stated that the guy had been beaten up, had the officers told him that fact." The court took note of Maciel's moderate impairment, but found he understood the interview process and gave appropriate responses to questions, and noted from Maciel's record that he had "significant exposure to the criminal justice system." Beyond the District Court's findings of fact and a reading of the interview transcript, an independent review of the audio recording of the interview, *Metz*, ¶ 30, reveals a loquacious Maciel who spoke at length and offered significant dialog with the officers. While it is true that officers informed Maciel that he could not leave the interview room during the lunch hour, he was never forced to speak. In fact, on multiple occasions, Maciel was asked to stop speaking,

8

not interrupt, and listen to what the officers were saying. *See State v. Scheffer*, 2010 MT 73, ¶ 31, 355 Mont. 523, 230 P.3d 462 ("[W]hile Scheffer asserts that his supposed requests for counsel were met with 'coercive responses' and 'interview tactics,' the fact is that [the officer] was simply attempting to respond to Scheffer's various questions and suggestions—obviously a difficult task, given Scheffer's repeated interruptions.").

¶13    These factors also weigh against Maciel's argument that his requests to "get out" and "I [don't][1] want to talk about this more" were unequivocal requests to stop the interview. After each of those statements, Maciel continued to speak at length, without restraint, and there were no tenuous pauses, leading the District Court to conclude that Maciel had not made unambiguous requests to stop talking. Regarding Maciel's statements, the District Court's finding, that his "expressions of wanting to get out of there is not clearly a statement of wanting to remain silent. The statement is equally a statement of wanting to get out of custody," is supported by the record. *See Scheffer*, ¶ 31 (determining that "[m]aybe I should talk to a lawyer" by the Defendant was not an unambiguous request for counsel).

¶14    After a review of the totality of the circumstances, we conclude the District Court did not err by determining Maciel's statements were not involuntary and that officers did not fail to honor any unequivocal requests to terminate the interview.

---

[1] As noted by the parties' briefing, this wording of this statement is disputed. The transcription did not include the word "don't" within the sentence, and the District Court quoted it without the word. Maciel maintains that is what he said. Given the context, and wanting to err on the side of caution, we assume Maciel is correct. On the audio recording, the word is not recognizable.

¶15 Alternatively, Maciel argues that Condition 18 of the judgment is illegal and should be amended to comport with the District Court's oral pronouncement. We review a district court's imposition of sentence for legality. Legality of a sentence is a question of law subject to de novo review. *State v. Thompson*, 2017 MT 107, ¶ 6, 387 Mont. 339, 394 P.3d 197 (citing *State v. Johnson*, 2000 MT 290, ¶ 13, 302 Mont. 265, 14 P.3d 480). A district court's oral pronouncement of a sentence is the legally effective sentence and the valid, final judgment, whereas the written judgment is merely evidence of the oral sentence. *Thompson*, ¶ 8 (citing *Johnson*, ¶ 15). When the oral and written judgments are in conflict, the oral pronouncement controls. *Thompson*, ¶ 8.

¶16 When orally pronouncing the judgment, the District Court modified Condition 18 so that Maciel would not need to complete a counseling program if he had already completed the program in prison. This is contradicted by Condition 18 of the written judgment, which does not give Maciel credit for previously completed counseling, forcing Maciel to retake the program. The State concedes the issue. The District Court's oral pronouncement requiring Maciel to pay for and complete a counseling program only if he did not previously complete the program differs from the written judgment. Therefore, Condition 18 of the written judgment must be revised accordingly.

¶17 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶18    Affirmed in part, reversed in part, and remanded to conform Condition 18 in the written judgment to the oral pronouncement of the sentence.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR